All right. United States v. Schmidt. Mr. Roman, I'm happy to hear from you. Thank you very much, Judge Wilkinson, and may it please the Court. When Congress enacted Section 2423C, its goal, as this Court observed in U.S. v. Bollinger, was to close existing loopholes that facilitated the abuse of children abroad by U.S. citizens. As the text of the statute and as its legislative history makes clear, Section 2423C, as originally enacted, criminalized every illicit sex act perpetrated by a U.S. citizen abroad. The District Court's holding that Mr. Schmidt is actually innocent of Count 10 is incompatible with that basic principle and should be reversed for three reasons. First, the defendant was traveling in foreign commerce when he fled to Cambodia in December of 2003 because he had left the country 18 months earlier and had never permanently resettled anywhere else. So, if we conclude that Mr. Schmidt was still in travel status, so to speak, then you win, the case is ended? We win and the case is ended. Okay. The second reason why the District Court erred, Your Honors, is even if Mr. Schmidt's travel ended at some point before December of 2003, he still violated the statute, for the very reason I mentioned at the outset, because Section 2423C criminalizes every illicit sex act perpetrated abroad by a U.S. citizen. Well, you agree he has to be traveling, don't you? He does not have to be traveling at the time that the sex offense occurred. No, but he has to be traveling. Yes, he has to have traveled in foreign commerce, Your Honor, that's correct. The statute uses the present tense, not the past tense. I'll go back to my first question. If we conclude he's still traveling, then we don't get to the second issue. That's very true. Absolutely correct, Your Honor. And the third reason why the District Court erred is even if the defendant is actually innocent of his plea-based convictions on Count 7 and Count 10, he still never should have secured collateral relief in this case, because he has never demonstrated his factual innocence of Counts 1 through 6 in his indictment, which charges the government dismissed in exchange for his guilty pleas as required by the Supreme Court's decision in Boosley v. United States. Accordingly, for all these reasons, Your Honors, we ask this Court to reverse the District Court's grant of collateral relief and to remand the case with instructions to reinstate judgment as to Count 10. Now, I would like to begin, Judge Agee, with the point that you've made, which is that in the government's view, Mr. Schmidt was still traveling at the time that he fled from the Philippines to Cambodia. And I think it's useful to look at the Ninth Circuit's opinion in Jackson in this case, where the Ninth Circuit laid out what it means to travel, provided a number of dictionary definitions, and concluded that the ultimate standard is a person permanently settled in a location is no longer traveling, even if that place was not his point of origin. Now, applying this — Well, it is a very long trip. Marco Polo, Your Honor, left Venice in 12 — Marco Polo? Left Venice in 1271 and returned to Venice in 1295. So he was traveling for 25 years, because he had never permanently settled in any other spot. And while it's sort of a — sort of a funny aside, it actually makes sense. So you want us to base decision on whether Marco Polo was a traveler? No, Your Honor. But I think it's — what is the objectively reasonable definition of the word travel? And I think the Ninth Circuit standard is a very useful one, which is — No, their — I mean, their point is how many people travel for three years abroad without stopping back by the United States. Well, I think on the facts of this case, Your Honor, certainly in contrast to the defendant in Jackson, where Mr. Jackson had permanently settled in Cambodia. He had bought a house there, unlike Mr. Schmidt, who never purchased any kind of a home once he was outside the United States. Mr. Jackson had pretty substantial financial ties in Cambodia. He had actually taken all of his money out of the United States, maintained a depository account here, and then essentially wired all the money to Southeast Asia, which is exactly the inverse of the case here, where Mr. Schmidt maintained a very large bank account here in the United States and at the time of his pre-sentence investigation had no assets abroad. Is it a factor in the travel analysis that Mr. Schmidt's — one reason for Mr. Schmidt's travel was that he was a fugitive from justice and fled the country in order to avoid arrest? I think it's one factor. It certainly explains, Your Honor, why he was sort of moving from place to place once he left the United States. I don't think, though, that it really gets into the question of his conviction under Count 10, which alleged a violation of 2423 C, unlike Count 7, which alleged a violation of B, which is actually a travel statute. And the government under Count 7 had to prove intent. You know, why did he — what was the state of his mind while traveling? Of course, Mr. Schmidt pled guilty to Count 7. But to answer your question, Judge Agee, under Count 10, I think the motivation for the travel is less important, the subjective intentions, and more the objective fact that he had never actually permanently settled anywhere else. So how do we determine whether someone is traveling? Is it a totality of a circumstances test? Do we look — I mean, do we look at the length of time he's away from the United States? Do we look at the number of countries he's visited? Do we look at what his activities were when he was abroad? It's — is there no — there's no one factor that wraps it up for us, is there? There is no one factor. It's got to be — it's got to be four or five things. It's a standard, Your Honor. That's right. Is he traveling with other people, or is he going by himself? Potentially. Does he surrender his passport? What — I mean, it just — is that a jury question? Well, it could be. Of course, Mr. Schmidt pled guilty in this case. He pled guilty, yeah. He did. It is a factor, Your Honor. I mean, I think it is a nuanced factor, sort of fact-driven inquiry, unlike the defendant in Jackson who actually wanted to give up his U.S. citizenship. And there's an — actually an affidavit in the record in that case where Mr. Jackson essentially wanted to spend the five years in Cambodia, which would have qualified him for Cambodian citizenship, and thus his sort of intention from the very beginning was to give up, leave the United States behind. There is no indication of any of that in this record, where Mr. Schmidt never gave up his U.S. citizenship, of course, and was traveling on his U.S. passport the entire time that he was abroad. So I think it's useful for this Court to compare this case on its facts to Jackson, and all of the various reasons why the Ninth Circuit found that Mr. Jackson had permanently settled in Cambodia, or actually run exactly the opposite direction in this case, where Mr. Schmidt did not purchase any home abroad. He was on tourist visas the entire time he was abroad, two-month increments. Once he arrived in the Philippines, a tourist visa for two months, which he then extended once or twice, he did get a work authorization. But that work authorization, which is actually in the joint appendix, specifically said that he's a non-resident person, right? Do we have to articulate a specific standard here in order to determine what travels in the pre-amendment sense of this particular statute means, or is it sufficient to say, if he wasn't traveling in Jackson, this case is not Jackson, then that's enough? How do you write the opinion for that? Well, if he wasn't traveling, then the question becomes is what is the function of that travel in foreign commerce element? And something that the Jackson Court didn't talk about, though other courts have, Pendleton, the Third Circuit in Pendleton, and really the Supreme Court in Torres versus Lynch, drew a distinction between jurisdictional elements and substantive elements of the crime. And I think it's pretty clear when you look at 2423C, especially in context, and you look at the legislative history, which of course informs the text. Are you saying that's how we identify the standard for traveling is to get into the substantive versus jurisdictional elements of the crime? That seems to be a kind of a murky leap to me. I think it's a fallback, Your Honor. I think you lead with a question of, well, what does it mean to be traveling? And if Mr. Schmidt was still traveling, then of course this is an easy case. If he wasn't traveling or if the travel had ended, I think you have to look at the element. And again, in Torres, the Supreme Court… To what degree is it permissible to interpret the word travel by looking at what Congress was trying to get at here? It's a continually amending statute in a broader and broader way. And we all know that many of these sex shops in Southeast Asia are patronized by ugly Americans. And part of the thing that financially sustains them and that contributes to the conscription of very young children and their induction into the sex trade, and it's underwritten and subsidized by people who journey from the United States and patronize these establishments over a period of time, and that it's really a worldwide scourge, and Congress was after it. Right. In whatever country it might occur. And when we interpret the word travel, we have to look at it in terms of what the legislative authority was trying to accomplish, don't we? Absolutely. You do, Judge Wilkinson. I think you've hit the nail on the head. Number one, what was Congress doing in 2003 when it actually enacted the PROTECT Act? It was filling a gap. Because the prior statute, which was 2423B, because it was just a travel statute that just focused on the act of travel, actually wasn't doing its job. Very few prosecutions were brought under that statute because it was so hard to prove. So that's the first thing. The second thing is the legislative history. You know, we have very clear statements on both in the House report that accompanied the predecessor bill, as well as statements on the floor. Mr. Smith, Congressman Smith from Texas. This legislation will send a message to those who go to foreign countries to exploit children that no one can abuse a child with immunity, no matter where the offense is committed. Counsel, just so I'm locating your argument kind of in the outline, are you still under point one, you think that this legislative history goes to how we construe whether the defendant was actually traveling at the time? I think it helps inform it. Yes, Your Honor. And it certainly gets to the second question, the second argument as well, which is, is it just a jurisdictional hook or is it some kind of substantive element? I think what Congress was trying to do was criminalize the illicit sex act. And that, Judge Harris, I think gets to my second point, which is that's why in the government's view, at least with respect to 2423C, the travel is just merely a jurisdictional element. It's not the substantive crime that Congress was addressing because it already had done that with B and that wasn't working. Can I ask you a question about that? I don't know the answer. This is a real question. Are there still federal criminal statutes where the jurisdictional hook is that a gun has crossed state lines? Yes, Your Honor. And in those cases, right, you don't have to prove that the gun recently crossed state lines or anything like that, do you? You do not. So Scarborough versus United States, Supreme Court decision. In fact, I prosecuted a defendant, Your Honor, not long ago where the gun traveled in foreign commerce in 1940. It was actually a Soviet gun. The defendant was born in 1965. So the connection to interstate or foreign commerce occurred before the guy was even born and under Scarborough. And by the way, Scarborough, the statute, the felon in possession statute, is in the present tense, right? It's whoever possesses in or affecting commerce. But whether the travel is a jurisdictional element or whether it's a substantive element, that wouldn't affect the breadth that we give to the term. It would not. I just think you have to go back to the basic purpose of what Congress was trying to accomplish. And if we ascribe a very narrow definition to travel, we're simply going to undercut all of Congress's efforts. I think that's absolutely right, Judge Wilkinson. And if anything, in the time since the actions in this case, Congress has tried to even clarify that this statute should be interpreted as broadly as possible by inserting that language about temporarily residing or living abroad. I see my time is up, Your Honor, so I'm happy to reserve some time for rebuttal if the Court has any other questions. Thank you. Let's see if you have any further questions. Pam. Ms. Davis, we are happy to hear from you. Please support Mary Davis on behalf of Mr. Schmidt. I'd like to start off first by addressing the Scarborough case. And it's true that Scarborough said that the possession has to be present. But also, it also has the language in regard to 922G, which makes possession of the firearm illegal if it has been shipped or transported. So that's in the past tense. Whereas 2423C is talking about travels and the illicit act. It's all within present tense. So Scarborough and Lane are distinguishable because they talk about past tense. Part of the statute is speaking of the past tense. And that's the, and also 2252A-4B, which uses the past tense of has been or transported. So why is he not traveling? He's not traveling because he went to the Philippines. He worked full time. He rented a home. He had a license. He was there for 18 months. He had no intent to return to the United States. But the statute doesn't necessarily turn on intent, does it? It doesn't have intent to, it doesn't have intent to return to the United States as one of its elements. I mean, I thought the mens rea element went to the illicit sex act. And that is whether you knowingly committed an illicit sex act as opposed to whether you were knowingly, or whether you intended to return to the United States. When you're trying to get to the mental element here, it's the illicit sex act and not the travel. But the statute says travels in foreign commerce. And this court has held in Bollinger that travels in foreign commerce means there has to be a nexus between the United States and the country where the illicit act took place. Aren't we bound by our precedent here in the Bollinger case? Because there we upheld 2423C convictions for someone who had been away from the United States for 5 years. That's correct, but that's a different issue. That's much longer than he was away. Right, but he remained in the same country. So there was the nexus between the United States and where Bollinger resided. What difference does it make whether he went to one or two or three countries? I don't understand that because many people who travel just go to one country, but many others go to two or three. They do, but they don't get jobs. They don't rent homes. They don't get driver's licenses. And if this court follows the reasoning of the United States, technically someone could travel around the world 20 years later and commit an illicit act and be found guilty of the statute. And I don't think that was the intent of Congress. The intent of Congress was to remove the intent element of subsection B. It did not mean that it will cover whatever act that takes place wherever it takes place. He never made any attempt to relinquish his U.S. citizenship. He never made any attempt to turn in his passport. He never purchased a home abroad. He didn't accumulate assets, so far as I know. I thought he maintained a substantial amount of money in the United States. I think that was a result of... Did he have bank accounts in the United States? I think he had an account as a result of his mother passing away. I think it was estate money. But I don't think the purchase of a home should decide this case. There's people in the United States that don't purchase homes. It's part of a total picture. And plus, I would point out that the defendant... But if he was locating permanently in the Philippines as opposed to traveling, why did he have no difficulty in pulling up stakes and moving quickly to Cambodia? Because he had some serious issues taking place in the Philippines. But that does sort of go to the question. He's a fugitive in the first place when he gets to the Philippines, and I do think that's relevant. Fugitives, particularly fugitives who are going to continue to commit the same crime, tend not to settle down. They have to keep moving. But at the same time, I think the Jackson case is helpful in this. Because the Jackson case focused on whether the person had an intent to remain as opposed to being physically present without the intent to stay. At the time, Mr. Schmidt went to the Philippines. He intended to stay in the Philippines. He worked there. He lived there. He had a car. I think he even had a... It seems like he intended to do what he did in the Philippines, and he intended to do it on a short-time basis until he got caught, at which point he would move on to a new country. Why isn't that a perfectly reasonable inference? I don't think there's any evidence to support that. I mean, I... It only meshes with the facts. I don't... But at the same time, Judge Harris, I think you have to look at what the implications are if you say that if someone is a sexual offender and they leave the United States, that they can be prosecuted no matter where they are when they commit the act. I'm sorry. No, I'm sorry. I was going to say that I understand the argument. It has limited application now because the statute has, again, been amended to cover that. But on the other hand, if you do have someone who's in a constant state of transit but maintains most of their U.S. connections, they maintain their assets here, their registration here, they vote here, there's no evidence that they have stopped for some significant period of time and set up housekeeping, so to speak, in another country, that would seem to indicate they're still traveling, even if it is a multiple time of years. The only asset Mr. Schmidt had in the United States, again, was the money in that bank account. That's the only asset he had. In the meantime, he was working in the Philippines, drawing a salary and paying all his expenses that way. But he's still a bit of a rolling stone because when it suits him, these routes that he was supposed to have set down, he just pulled up stakes in a hurry and went to the Philippines. I think this Court has to look at what the intent was when Mr. Schmidt traveled from the United States to the Philippines. When he got... He had to get out of Dodge before he got arrested. That's one thing, right. That was his reason for travel. Right, that was his reason for traveling initially. But there's nothing to indicate that at the time he settled in the Philippines, that he intended to leave the Philippines. I mean, there's just nothing there. His intent at the time was to remain where he... In terms of the criminal law, when we talk about intent, the way I think the statute is written is that the intent bears on the intent to commit an illicit sex act. Perhaps knowing someone is a minor or knowing what you're doing is an unlawful sex act. It doesn't... It doesn't seem to me to require an intent to travel. He can be traveling without necessarily having an intent to travel. But where the criminal act comes in is when a sex act is taken with an unlawful intent. In his case, he was knowledgeable that the people with whom he was having sexual relations were minors, very young minors in some cases. That's where the intent comes in. The intent doesn't come in necessarily in terms of whether he's... whether he intends to travel or even... It's a fact. It's whether he is traveling, not whether he intends to travel. It's whether he is. Whether he travels and commits the offense. But where do we draw the line on travels? I mean, there has to be a nexus between the United States and the country. Where the act took place. And so, therefore, you're right. I mean, sufficient unto the day. I mean, a lot of times courts simply decide a case based on the facts of the case before them. We don't need to hypothesize about all the different people who may be absent from the country for 20 years, do we? I think... This is not someone who's been absent from the country for 20 years. No, he was absent from the country for 18 months and residing someplace else. And this is what, obviously, Judge Motz based his decision on. And I think there are... And the government argued... There were many pleadings back and forth following Judge Motz's decision on the 2255. And Judge Motz rejected all of those arguments. And the implication of that is that the 18 months that he spent in the Philippines broke the nexus. That there was no travel... He was not traveling in foreign commerce when he went from the Philippines to Cambodia. So is that a factual decision made by Judge Motz or a legal conclusion? I think it's a combination, but I think it was based on the facts. I think if... And the cases also speak of the point... Well, if the person had stayed longer, well, then it would have been a different implication. We would have decided this case differently. In cases where there was long stretches between the time from when the person leaves the United States until they commit the act, that is an important factor. The length of time is important. If we were going to state some prudential standard for these cases, what would you say that would be? That the... The person making... The judge making the decision has to look at the facts and determine whether there was an intent to remain where the person went to. In this case, the Philippines. Mr. Schmidt had the intent to stay in the Philippines and that his travel... What's the evidence that supports that as opposed to the fact that he had an intent to leave the United States and the Philippines seemed like a good first place to go? Because he lived in the Philippines. He worked in the Philippines. He had a home in the Philippines. Wherever he went, he would have had to do that, right? But he resided there. It was his intent to reside there. And what proves that? The fact that he had a job, that he had a home, that he was there 18 months. I... There has to be a point... Mr. Judge, Steve, did I interrupt you? I was just going to say, wasn't it sufficient to say if this is a concern, you can see what the facts were in the Jackson case that the Ninth Circuit said, well, this is sufficient to show that travel had ended, but it's not sufficient in this case. I mean, what's wrong with that as a case-by-case adjudication? I mean, why do we have to come up with a prudential standard that covers all cases? I think what you have to do is you have to look at what Judge Motz did. And Judge Motz held that there was no longer travel and foreign commerce based on the facts that were before him. And those facts were that he went to the Philippines, lived there, and worked there. When a district judge dismisses a count in the indictment, normally, let's say, I think Rule 29 just dismisses a count in an indictment, doesn't the district court say to itself, I'm dismissing this count of the indictment because there's no way the government can possibly prove it. Right. And so, isn't that the same standard here? He has to say, look, if you're going to essentially say factual innocence and dismiss the count in the indictment and hold that the prosecution be dismissed, don't you have to say something like this is not, the government can't prove this? Well, basically what Judge Motz said is that there was based on Bollinger that there was no travel and foreign commerce. That's specifically what the judge said. And so that was based, obviously, on the facts that were presented to him. And that was that Mr. Schmidt spent 18 months. I have no idea what the district court was thinking. I have to say, I don't mean that in a disrespectful way or that I can't understand how a district court could come out this way, but the district court doesn't explain, I mean it doesn't talk about any of this, right? It was a very short, very short. But it does state in the memorandum at one point that based on Bollinger, he found that there was no travel and foreign commerce. Then the government filed the motion for reconsideration. Does he say why based on Bollinger? I mean that case seems an odd one for me because that dealt with travel that was post enactment. So you don't have the issue that you do in this case. And it found in favor of the government. So I'm having difficulty seeing how that case bolsters Judge Motz's decision. Because the pleadings before he made his decision focused on the fact of the definition of travel and foreign commerce, which required a nexus. Although when Bollinger talks about the nexus, they're talking, they're construing there the foreign commerce clause. Exactly. My recollection was that they concluded that the nexus is satisfied through U.S. citizenship and the foreign commerce clause can then be employed any time that what a U.S. citizen is doing abroad has substantial effects on foreign commerce. But there has to be a nexus between the United States and the country. Right. And they say, and they find that nexus in United States citizenship. I don't know the part where you... I think it also, I don't have it right in front of me, but I think it requires that there be a nexus between the country that he traveled to, between the United States and the country that he traveled to. It would have been different, it seems to me that travel would be more important had Bollinger rested on the instrumentalities prong that was put in front of it, like maybe what you really care about under this clause is that somebody flew in interstate commerce, used an airplane, was himself in interstate commerce. That kind of rationale would really put a lot of emphasis on this whole travel thing, but that's not the rationale the court used. The court instead used the effect on foreign commerce that is generated when U.S. citizens go abroad to rape and sexually abuse children in foreign countries, that that is really bad for foreign commerce, and that's what they relied on. It was the act, not the travel. But I think the Weingarten case addresses that, and that's the reason that he was successful, was because there was travel from the United States to another country, then to another country. The other case that I think is important is the government relied upon the dissenting opinion in it. Clark, where even where Clark said that yeah, the majority opinion noted that if there had been a longer gap between the travel and the act, it might trigger other concerns that the court was not addressing at the time. There, there was just a two-month period between leaving the United States, he traveled through, stopped through three other countries, I think I'm being unartful about this, is that under Bollinger, that really doesn't raise constitutional concerns in the Fourth Circuit because the Fourth Circuit has relied on the combination of U.S. citizenship and then an act abroad that has substantial effects on foreign commerce. But I believe Bollinger also says, and my interpretation of it, with all due respect, is that there has to be, that that nexus has to be between, would have to be between the United States and Cambodia, but that nexus is broken when he spent all that time residing in the Philippines. I think Bollinger says that, there needs to be a nexus and it can be broken if someone stays for too long in one country. I believe so, and I think, I believe so, yes. The statute itself starts out with the words any United States citizen. So isn't the nexus with the United States primarily one of citizenship, the fact that you are enrolled, the fact that you are a citizen in this country because I'm not sure ultimately that the statute may, maybe it hinges upon the length of time that someone is abroad, but maybe the critical fact is that the person is a United States citizen because what the Congress wanted to do was prohibit United States citizens committing illicit sex acts abroad. It didn't just want to prohibit United States citizens who were away from the country for six months or 12 months or 18 months from committing illicit sex acts abroad. It wished to prohibit United States citizens, period, from committing illicit sexual activity while abroad. The statute says as long as you're a United States citizen and you travel abroad, don't do this. Travel and foreign commerce though, that's what the statute says. I would note that the government conceded that Judge Motz was correct on count seven because the government said that there was no nexus in that count. That count failed because it stated that there's travel between the Philippines and Cambodia. And the government conceded that Bollinger stands for the proposition that there had to be a nexus between the country where the act took place. That is the reason the government... Yes, but I thought Judge Harris made an excellent point when she said that you are interpreting the word commerce. It's not... It's a question of whether the acts in their totality have an impact upon commerce. It's not whether just a single sex act has an impact upon commerce. It's whether this whole pattern of Americans going abroad and engaging in this kind of behavior has an effect on commerce. And we use a principle of aggregation here to determine that effect, which it seems to me argues against giving a cramped interpretation to the word commerce. Certainly, I understand the argument that's brought up in 18 U.S.C.A. Section 10, but I don't see those words as words of limitation. It says what commerce includes, it doesn't say is limited to. But the commerce that the statute is looking towards is the commerce that has a nexus with the United States. The United States has no control over what takes place in Cambodia unless there's a nexus between the United States and Cambodia. And once Mr. Schmidt spent 18 months in the Philippines, there was no nexus to Cambodia. If he had traveled from the United States... Don't you think people in Cambodia think that when a United States citizen in Cambodia is committing these illicit sex acts, you don't think they think there's a nexus through United States citizenship? And I'm pretty sure that's what the court held in Bollinger, that it's the citizenship that's the problem. But there also, there's Bollinger also said... Do you think the people in Cambodia think, well, he came from the Philippines, so I guess it's not really a U.S. issue? Well, no, I don't think that at all. But I think Bollinger also said that there has to be, that we cannot control the other countries, cannot listen to what our laws are unless there's a nexus to that country. And I think any case that has discussed 2423C looks at the length of time that the person has spent before they go on to the country where the act took place. I don't think there's any case... I don't think you could find a member of Congress who voted for that statute who would say, oh, well, if somebody's been away from the United... if a United States citizen has been away from the United States from three years and is committing a series of illicit sex acts, no problem, that's okay. There's a cooling off period. Well, if Mr. Schmidt had bought a house, then perhaps Congress would say that's okay? Oh, so if somebody who... that can't be the test of whether they bought it. Right, that can't be. But Jackson looked at those factors. Jackson said, look, he bought a house and he had money being sent over there. But Jackson still held on to his U.S. passport. Jackson was also in the process of fulfilling the requirements for Cambodian citizenship. That's correct, but I think we can't look at every specific fact. I think we have to look at what took place, and in this case, what took place... But once you put them all together in the totality, Jackson was enough, and perhaps in this case, it was not. But there has to be a line drawn somewhere, and I think that line has to focus on, first off, the length of time that someone is spending in another country. I think we're going over the same brink. I think we have to. Thank you very much, Ms. Davis. We do appreciate it. Okay, thank you. Mr. Roman, you have some time for rebuttal. Is there anything that the panel has overlooked here? No, Your Honor. I certainly will not belabor my time in front of the Court. I'd say simply that I think Judge Wilkinson, your point about focusing on the facts of this case, certainly the government would endorse that approach. As you observed, Your Honor, Any U.S. Citizen is the text of the statute. I'd go further. The title of the statute, which, of course, is an aid to statutory construction, says, Engaging in Illicit Sexual Conduct in Foreign Places. Categorically, that's it. And it begins with the word any. Any, right. Any. Absolutely correct. Judge Agee, you had asked me earlier, is it relevant, the fact that Mr. Schmidt was a fugitive? In listening to some of the byplay in my friend's argument, I think I should change my answer. Absolutely. I think the fact that he's a fugitive is relevant here because it's one of the reasons why he took off and then was sort of transiently moving from place to place once he was abroad. So on the particular facts of this case, when you look at the particular factual matrix in this case, it is relevant, and I think that's why this case is very different than the Jackson case where... The defendant in Jackson was not a fugitive from justice. He was not. He was not. I don't want to belabor my time, Your Honor. If there's any other questions, I am more than happy to answer them. We have no further questions. We'd like to come down and greet... Oh, Ms. Davis, I want to notice that your court assigned and you did a fine job with the case, and I really want to express the court's appreciation of the diligent manner in which you proceeded. We'd like to come down and greet both of you and proceed into our final case.
judges: J. Harvie Wilkinson III, G. Steven Agee, Pamela A. Harris